JOHN MCLEOD, JR., by JOHN MCLEOD, his Next Friend, v. LINDE AIR PRODUCTS COMPANY.—1 S. W. (2d) 122.

Division One, December 7, 1927.

398

*Thomas H. Kingsley* and *George Kingsley* for appellant.

*Darius A. Brown* and *Maurice Weinberger* for respondent.

GANTT, J.—This is a suit for personal injuries, alleged to have been received by plaintiff as a result of the negligence of defendant. The facts are as follows:

Plaintiff is the son of John McLeod, who, on the 9th of January, 1917, and for nine years prior thereto, operated a welding shop in Kansas City, Missouri, under the name of the Oxy-Acetylene Welding Company. The defendant manufactured oxygen, and during the eight months prior to plaintiff's injury had sold about one hundred tanks of oxygen to plaintiff's father for use in his welding business. The oxygen was delivered in steel tanks of two hundred cubic feet capacity and at a pressure of 1800 pounds to the square inch. The tanks were cylindrical in shape, twelve inches in diameter, five feet in height, stood upright on a flat base, and were equipped with a brass valve at the top of the tank, with an outlet of three-sixteenths of an inch in diameter. The tanks were not sold to McLeod, Sr., but were returned to defendant when empty. McLeod, Sr., had a low pressure tank, and on a delivery of oxygen would transfer it from the defendant's tank to his tank by connecting the tanks with a steel pipe, about two and a half feet in length, which pipe-line consisted of two pieces of pipe and three brass couplings.

On the afternoon of the 9th of January, 1917, defendant delivered two tanks of oxygen. Thereupon, McLeod, Sr., directed one Braymer, an employee, to transfer the oxygen to the McLeod tank. The connection having been made, Braymer "cracked" or slightly opened the valve of defendant's tank to permit the oxygen to flow into the McLeod tank. When oxygen flows through the connecting pipe-line it makes a hissing sound and tends to make the pipe cold. No such sound followed the opening of the valve on this occasion and the pipe was not cold. Braymer then knew the oxygen was not flowing. This caused him to believe defendant had delivered an empty tank, as had occurred on a former delivery. Accordingly he closed the valve on

defendant's tank and disconnected the two tanks by removing the pipe-line, leaving attached to the valve of defendant's tank a brass coupling. Then, to determine whether the defendant's tank was in fact empty, he again opened the valve thereon and held his hand over the opening. It seems that when a tank is emptied of oxygen, in a commercial sense, some little of the gas will still remain. After holding his hand in this position for a short time, he concluded there was no oxygen in the tank and left the valve open. In a few seconds the gas, with 1800 pressure to the square inch, forced itself through the valve, with a loud report and in an explosive manner, driving into Braymer's face particles of rust or metal, causing the tank to topple over and the brass coupling on the valve to strike a steel table, thereby chipping a piece from the brass coupling and driving it into the skull of plaintiff, who was standing about eight feet from the tank.

Plaintiff was fifteen years of age, attended school and after school hours made collections for his father. He had collected a bill and was there to turn over the money. Braymer had been working for McLeod a year, and during this time always attended to transferring the gas from defendant's tank to McLeod's tank. On this occasion the transfer was being made in the usual manner. The next morning an employee of defendant's came to McLeod's, the tank was opened, turned upside down and water flowed from the tank, a sample of which was placed in a bottle by McLeod, Sr., and exhibited to the jury.

It is the contention of plaintiff that the opening in the valve of defendant's tank was clogged and stopped by an accumulation of rust or other foreign matter which prevented the escape of oxygen when the valve was "cracked" or slightly opened. Other facts will be noted.

The negligence charged is as follows: (a) that as the direct result of the negligence of defendant in furnishing a defective, unfit and unsafe tank for the purposes for which it was intended by defendant to be used plaintiff was injured; (b) that defendant knew or should have known that oxygen when confined in a tank with a pressure of 1800 pounds to the square inch is likely to cause injury if the tank is defective, unfit or unsafe in construction or condition; (c) that defendant knew or should have known that if the tank was defective, unfit and unsafe in construction or condition for the purposes for which defendant intended it to be used, injury would likely result to those using the tank for said purposes, or to those in close proximity to the tank while the same was being used; (d) that it was the duty of defendant to furnish a tank which was in a proper, secure, fit and safe condition to be used for the purpose for which defendant intended it to be used; (e) that defendant ignoring this

duty furnished a tank which was defective, unfit and unsafe for said purpose in this, that the valve of said tank through which the oxygen was to be removed was clogged, obstructed and rendered unfit for use by the presence in said valve of water, rust or other substances so that the free escape of the oxygen from the tank in the usual manner was prevented; that at the time of furnishing the tank defendant knew or should have known of its defective condition and omitted to use reasonable care to discover its defective condition.

Answer is a general denial. At the close of plaintiff's evidence, defendant tendered a peremptory instruction in the nature of a demurrer, which was refused. Defendant offered no evidence and tendered no instructions. The case was submitted on instructions given at the request of plaintiff. Judgment was for $12,000, and defendant appealed.

I. Appellant contends there was no evidence that the valve of the tank was obstructed when it left the custody of appellant. Within fifteen minutes after the delivery of the tank the connection was made between the tanks for the purpose of transferring the oxygen to the McLeod tank. If the valve became clogged after the tank left the custody of appellant, it must have done so within this fifteen minutes. There is no evidence that the valve was handled by any one during this fifteen minutes. It is also contended that the obstruction might have been in the pipe-line connection instead of in the valve of the tank. The pipe-line, the couplers and the tank were exhibited to the jury. It does not appear that appellant directed the jury's attention to any evidence of rust in the pipe-line or the couplers. If the valve had not been clogged, the oxygen would have instantly rushed from the tank when Braymer completely opened the valve. These questions were for the jury; the contentions are overruled.

II. Appellant contends that it owed no duty to respondent; that no contractual relation existed between them. The rule invoked is stated by a standard text as follows: "The general rule is that a contractor, manufacturer, vendor or furnisher of an article is not liable to third persons who have no contractual relations with him for negligence in the construction, manufacture or sale of such article." [2 Cooley on Torts (3 Ed.) pp. 1486 et seq.] There are three exceptions, stated in 29 Cyc. 478, as follows:

"1. Where the negligent act is imminently dangerous and is committed in the preparation or sale of an article intended to preserve, destroy, or affect human life; (2) where the act is that of an owner combined with an invitation to the party thereby injured to use the defective appliance on such owner's premises; (3) where the act

consists in the sale and delivery of an article with knowledge of undisclosed danger and without notice of its qualities, whereby any person is injured in a way that might reasonably have been expected.''

The cases are reviewed in Tomlinson v. Armour & Co., 19 L. R. A. (N. S.) 923 (note), and Mazetti v. Armour & Co., 48 L. R. A. (N. S.) 213 (note). We have approved the rule with its exceptions in the following cases: Heizer v. Mfg. Co., 110 Mo. 612; Tipton v. Mfg. Co., 302 Mo. 179, 275 S. W. 791; Roddy v. Mo. Pac. Ry. Co., 104 Mo. 1. c. 246; Young v. Waters-Pierce Oil Co., 185 Mo. 1. c. 654.

In MacPherson v. Buick Motor Car Co., 217 N. Y. 1. c. 389, wherein defendant was held liable when an automobile, manufactured by defendant and purchased by plaintiff from a dealer, collapsed because of a defective wheel, the court said:

''If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully.''

The MacPherson case was followed and approved in the case of Johnson v. Cadillac Motor Car Co., 261 Fed. 878; Cadillac Motor Car Co. v. Johnson, 221 Fed. 1. c. 805.

In Keep v. National Tube Co., 154 Fed. 121, wherein the defendant manufacturer was held liable to plaintiff's intestate, an employee of the vendee, who was killed by the bursting of a cylinder under pressure, the court said, at page 128:

''If these averments set forth any legal duty owing from the defendant to Keep, it was not a duty arising out of contract. The only contract referred to is the one between the defendant and Keep's employer. Keep was a stranger to that contract, and could acquire no rights under it. Nor are the averments based on the theory of any contractual relations between the defendant and Keep. The gravamen of the complaint is negligence, and not breach of contract, or fraud or deceit. The question, then, is not whether the defendant is guilty of a breach of contract, or suppressed facts amounting to fraud, or made representations amounting to deceit, but whether it owed to Keep the duty of reasonable care in the manufacture of the cylinder. According to the averments, which on this demurrer must be accepted as true, the cylinder was delivered to Keep's employer for use in storing gases at a pressure exceeding 3600 pounds to the square inch. It is obvious that if, by reason of a latent defect, it was incapable of withstanding a pressure greater than one-third of 3600 to the square inch, it would become a thing highly dangerous to any one who might be near it when applied to its intended use. The law

declares that a vender of poisonous drugs must carry on his business with due regard for the safety of the public, as well as his vendees. Such a rule is founded on the demands of social justice. It has often been applied to sales of things inherently dangerous. In the present case, the cylinder was not of itself a dangerous thing. It became so only when charged with gas; but it was made for the purpose of being charged with gas. Uncharged, it was a useless thing. When applied to the only use for which it was made, it exploded and killed the plaintiff's intestate. If the explosion was due solely to negligence in the manufacture of the cylinder, why should not the manufacturer respond in damages for its negligence? The authorities on the point are not harmonious; but the better doctrine, it seems to me, is that the manufacturer of a thing inherently dangerous, or of a thing which when applied to its intended use becomes dangerous, is liable in damages to any one who, without fault on his part, sustains injury which is the natural and proximate result of the manufacturer's negligence.''

In Statler v. Ray Mfg. Co., 195 N. Y. 1. c. 480, 88 N. E. 1063, the defendant was held liable when a coffee urn purchased by plaintiff's employer from defendant exploded and injured plaintiff on the theory ''that defendant well knew the purposes for which its urn was to be used; that the latter was of such a character inherently that, when applied to the purposes for which it was designed, it was liable to become a source of great danger to many people if not carefully and properly constructed; that the defendant negligently and carelessly constructed it so that it was imminently dangerous when employed as intended to be; and that as the natural and direct result of this negligent and heedless conduct the urn exploded and the plaintiff was injured.''

In Van Winkle v. Boiler Ins. Co., 19 Atl. 1. c. 475, wherein the defendant, having undertaken the inspection of the boiler, was held liable for damages to the property of the plaintiff by the explosion of the boiler, the court said:

''And it would seem that there is a broader ground than the one above defined, on which the present case can be based. It is this: that in all cases in which any person undertakes the performance of an act, which, if not done with care and skill, will be highly dangerous to the persons or lives of one or more persons, known or unknown, the law, *ipso facto*, imposes as a public duty, the obligation to exercise such care and skill. The law hedges round the lives and persons of men with much more care than it employs when guarding their property, so that, in that particular, it makes, in a way, every one his brother's keeper; and therefore it may well be doubted whether in any supposable case redress should be withheld from an innocent person who has sustained immediate damage by the neglect of another

in doing an act which, if carelessly done, threatens, in a high degree, one or more persons with death or great bodily harm. Such misfeasances, if they result fatally, are indictable crimes. When they inflict particular damage upon individuals, they should, it is conceived, be actionable."

In Stolle v. Anheuser-Busch, 307 Mo. 1. c. 529, 271 S. W. 1. c. 500, wherein the plaintiff's wife, an innocent by-stander, was injured by the explosion of a bottle of "Budweiser," we said:

"These bottled beverages, containing explosive gases, are put upon the market with the intention that they will be transported throughout the country and sold to consumers for the profit of the manufacturer. Obviously, this should be at his risk. Public policy requires that the manufacturer should assume the risks and hazards of explosion incident to the reasonable and ordinarily careful transportation and handling of these goods in the usual course of business. The rule of liability announced in Grant v. Bottling Co., supra, is sane, logical, reasonable and practical and in accord with the rule of decision in this State. It is fair to the manufacturer, and will afford the consumer of the beverage and those handling it in the ordinary course of trade reasonable protection, while the contrary rule leaves them practically without redress."

In the instant case there is no evidence that the defendant knew the valve was clogged, and there is no charge or evidence of fraud. The question for solution is whether the defendant owed a duty of care to the public.

The early cases limited exception one to things in their nature destructive, such as poisons, explosives, and deadly weapons. [Huset v. Case Threshing Machine Co., 120 Fed. 865.] We think the exception should be extended to include "a thing which when applied to its intended use becomes dangerous," although not inherently so. There is no reason why the principle should not apply to things imminently dangerous, whether inherently so or not. Appellant knew the oxygen under such pressure was a dangerous thing and knew it would be removed through the valve. Indeed, appellant intended it to be so removed. There was no way for McLeod, Sr., or his employees to inspect the valve. It was the duty of appellant to do so before the tank was filled. There was no improper handling of the tank or the valve by Braymer in his effort to transfer the gas. He proceeded in the usual way, and no trouble had been experienced in making the transfer on former occasions. When he "cracked" or slightly opened the valve no gas escaped. He concluded the tank was empty. This was not an unreasonable conclusion, for on one or more occasions appellant had delivered to McLeod, Sr., an empty tank. Believing the tank to be empty, he completely opened the valve; and, in a few seconds, the high pressure forced the gas through the ob-

structed valve. Appellant owed to the public the same duty of care to have the valve in working condition that it owed to have the tank of sufficient strength to withstand the high pressure of gas. The question of proximate cause was for the jury. [Smith v. St. Joseph Ry. L. H. & P. Co., 276 S. W. l. c. 609.] It is insisted by appellant it could not reasonably have anticipated that injury would result from the clogged condition of the valve. In ruling on the question in the case of Buckner v. Horse & Mule Co., 221 Mo. l. c. 710, we said: "It is not essential that defendant could have anticipated the very injury complained of, or that it could have anticipated that it would have occurred in the exact manner in which it did occur, but it is sufficient if the negligence of the defendant was the proximate cause of the injury." [Dean v. Railroad, 199 Mo. l. c. 411, 97 S. W. 910; Harrison v. Light Co., 195 Mo. l. c. 629, 93 S. W. 951; Hoepper v. Southern Hotel Co., 142 Mo. 378, 44 S. W. 257.] The contentions are overruled.

III. Appellant complains of the following instruction, given at the request of respondent:

"The court instructs the jury that if you find and believe from the evidence that on the 9th day of January, 1917, the defendant sold and delivered to the Oxy-Acetylene Welding Company about two hundred cubic feet of oxygen confined in a steel tank or container in which the pressure of said oxygen was about 1800 pounds to the square inch; that said steel tank or container was furnished by defendant for the purpose and use of containing and storing said oxygen until the same could be removed therefrom by said Oxy-Acetylene Company to the tanks or other containers of said company; that defendant knew, or by the exercise of ordinary care could have known, if so, that oxygen, when contained in a steel tank or container with a pressure of 1800 pounds to the square inch, is a thing or substance obviously likely to cause injury if the tank in which the same is contained is defective, unfit or unsafe in construction or condition; that defendant knew, or by the exercise of ordinary care, could have known, that if said tank was defective, unfit or unsafe in construction or condition for the purpose and use for which defendant intended the same to be used, injury would be likely to result to those using the said tank for the purpose and use it was intended by defendant to be used, or in close proximity thereto while same was being so used; and that defendant negligently, if so, furnished a steel tank which was defective, unfit and unsafe for said purpose and use, if so, in this, that the valve of said tank through which said oxygen was to be removed, when said tank was furnished by defendant, was clogged and obstructed and rendered unfit for said use by the presence in said valve of water,

rust and other matters and substances so that free escape of said oxygen from said tank in the usual manner was prevented; that at the time of furnishing said tank defendant knew, or by the exercise of ordinary care could have known, of the defective condition, if any, or omitted to use ordinary care to discover its defective condition, if any; and if you further find and believe that as the direct result of the negligence of defendant, if any, the plaintiff was injured, then your verdict will be for the plaintiff, and provided you find plaintiff was in the exercise of ordinary care for his own safety.''

Appellant's criticisms of the instruction rest on its contentions heretofore overruled. The petition charges the tank to be defective, unfit or unsafe in construction or condition. There is no evidence of defective construction. While the first part of the instruction refers to defective construction, yet when the jury is required to find the negligence, if any, of the defendant, the question of the construction of the tank is omitted. The instruction is within the negligence alleged in the petition, is supported by the evidence, and we think correctly declares the law. The contention is overruled.

IV. Respondent suffered serious injury. A small piece of steel or iron penetrated his skull about an inch and a half, wholly destroying the sight of his left eye, necessitating an operation, and causing respondent great pain and suffering. While appellant **Excessive Verdict.** in its motion for a new trial charged the verdict to be excessive, the question is not mentioned in either its assignment of errors, points and authorities or argument; therefore, we will treat the assignment as having been abandoned. It follows the judgment should be affirmed. It is so ordered. All concur.